Jayrie **RIVERA–CONCEPCIÓN,** et al., Plaintiffs,

v.

Commonwealth of **PUERTO RICO,** et al., Defendants.

Civil No. 08–2378 (BJM).

United States District Court, D. Puerto Rico.

April 29, 2011.

---

Daliah Lugo–Auffant, Miguel A. Perez–
Vargas, Perez Vargas & Lugo Auffant
Law Offices, Hato Rey, PR, for Plaintiffs.

Jorge Viera, Vega Alta, PR, pro se.

### *OPINION AND ORDER*

BRUCE J. McGIVERIN, United States
Magistrate Judge.

Before the court is the latest phase in
the litigation arising out of plaintiff Jayrie
Rivera–Concepción's ("Jayrie") expulsion
from the Córdova and Fernós Congres-
sional Internship Program ("Program") in
January 2007 after apparently undergoing
a manic episode of bipolar disorder. (*See*
Docket No. 10–3). Defendants the Com-
monwealth of Puerto Rico, the Puerto Rico
Senate ("Senate"), and the Puerto Rico
House of Representatives ("House") (col-
lectively, "defendants" or "moving defen-
dants")[1] move for summary judgment on
the claims brought by plaintiffs Jayrie,
Jorge Viera, and Cynthia Concepción (col-

lectively, "plaintiffs") under Title II of the
Americans with Disabilities Act of 1990
("ADA"), *as amended,* 42 U.S.C. § 12101
*et seq.,* and section 504 of the Rehabilita-
tion Act of 1973, *as amended,* 29 U.S.C.
§ 701 *et seq.* ("Section 504"). (Docket
Nos. 87, 88). Plaintiffs oppose (Docket
Nos. 91, 92), and defendants reply. (Dock-
et Nos. 106, 107). For the reasons that
follow, the court **grants** summary judg-
ment to the moving defendants.

### STANDARD OF REVIEW

Summary judgment is appropriate "if
the movant shows that there is no genuine
dispute as to any material fact and the
movant is entitled to judgment as a matter
of law." Fed.R.Civ.P. 56(a). A fact is
material only if it "might affect the out-
come of the suit under the governing law."
*Anderson v. Liberty Lobby, Inc.,* 477 U.S.
242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986). In determining if a material fact is
"genuine," the court does not weigh the
facts but instead ascertains whether the
"evidence is such that a reasonable jury
could return a verdict for the nonmoving
party." *Id.; Leary v. Dalton,* 58 F.3d 748,
751 (1st Cir.1995).

"[A] party seeking summary judgment
always bears the initial responsibility of
informing the district court of the basis for
its motion, and identifying those portions
of the [evidence] ... which it believes
demonstrate the absence of a genuine is-
sue of material fact." *Crawford–El v.
Britton,* 523 U.S. 574, 600 n. 22, 118 S.Ct.
1584, 140 L.Ed.2d 759 (1998) (quoting *Cel-
otex Corp. v. Catrett,* 477 U.S. 317, 323, 106
S.Ct. 2548, 91 L.Ed.2d 265 (1986)); Fed.
R.Civ.P. 56(c)(1)(A). Once this threshold
is met, the burden shifts to the nonmoving
party, who "must do more than simply

---

**1.** While other defendants are parties to the
case besides the House, Senate, and Com-
monwealth, I will use the term "defendants"

for convenience to refer to the moving defen-
dants.

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Of course, the court draws inferences and evaluates facts "in the light most favorable to the nonmoving party." *Leary*, 58 F.3d at 751.

## FACTUAL AND PROCEDURAL BACKGROUND

The following material facts, which will be viewed in the light most favorable to plaintiffs as the nonmoving party, are either undisputed or conclusively supported by the evidentiary record except where otherwise noted.[2]

The Program was created by law to provide internship opportunities to undergraduate students who have completed at least half of the necessary requirements for a bachelor's degree and graduate students enrolled in post-secondary institutions in Puerto Rico. Program participants would receive a salary and stipend for lodging and transportation during a maximum of four months working full-time at the office of the congressperson, Puerto Rico or federal administrative agency, or independent agency or institution at which they were placed. The Program is implemented and operated through a Joint Commission of the Puerto Rico Legislative Assembly. The members of this Joint Commission are the Presidents of the Senate and the House of Representatives, the speakers of all political parties in both legislative bodies, and the Presidents of the Legislative Commissions in charge of international and federal affairs in both legislative bodies. (Docket No. 87, ¶¶ 1–3 (citing 2 L.P.R.A. §§ 802, 804)).

At all relevant times, the Program was administered under the aegis of the Office of Legislative Services of the Legislative Assembly of Puerto Rico ("OSL"). The operating funds of the OSL and the programs it administered were accounted for and managed separately from the funds of either of the chambers of the Legislative Assembly or the other legislative agencies. The source of all OSL and Program funds was the Commonwealth's General Fund. The OSL neither requested nor received federal funds or grants for the Program, nor did it otherwise request or receive any other federal funds or grants. (Docket No. 87, ¶¶ 4–6).

The Washington Center ("TWC" or "Center") is a private, non-profit organization established in 1975 with headquarters in Washington, D.C. Its mandate is to organize internship placements, academic programs and seminars, and other prac-

---

**2.** In determining what facts are supported by the evidentiary record, I have applied Local Rule 56(e):

> Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent

duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

The court notes that plaintiffs did not include a cover sheet or other identifying information for the deposition transcripts included as exhibits with plaintiffs' opposing statement of material facts (Docket Nos. 91–1, 91–2, 91–3, 91–4), but the court will consider the depositions since they were not challenged by defendants. (Docket No. 107). The court further notes that the paragraphs in plaintiffs' opposing statement of material facts are misnumbered; the court uses the correct numbering. (*See* Docket No. 91).

tical on-the-job training experience in the United States Congress and other private, governmental, and non-governmental sectors in the Washington, D.C. area. (*Id.,* ¶ 7). The Legislative Assembly, through the OSL, entered into a Cooperation Agreement with the Center to operate the Program during the period relevant to this case. (*Id.,* ¶ 8). Through the Cooperation Agreement, the OSL was obligated to conduct the Program's selection process and recruit up to 21 candidates according to the general eligibility criteria established by TWC and the Program; cover the cost of the Program, housing fees, and transportation to and from San Juan; and provide Program participants a modest living allowance to cover food, commuting, and other personal expenses. (*Id.,* ¶ 9). The Cooperation Agreement obligated TWC to grant admission to the qualified candidates selected by the OSL, employ a fulltime program advisor dedicated to serve Program participants, administer the Program, conduct a full-day orientation with participants in San Juan, place each Program participant in a relevant placement to perform his or her internship, organize educational tours, site visits, and other activities and events, offer each participant a choice of academic courses for weekly class enrollment, facilitate the evaluation of the intern's performance, and provide housing and student life services to all Program participants. (*Id.,* ¶ 10).

Plaintiff Jayrie Rivera–Concepción applied to the Program on October 20, 2006. On the Program application form, she left blank the sections titled "Please indicate any special needs or requirements" and "Please inform us of any special conditions TWC should be aware of in order for you to fully participate in our program. Use a separate sheet if necessary." (*Id.,* ¶¶ 11–13). In December 2006, Jayrie received a letter signed by nonmoving defendant Francisco Rodríguez–Carambot ("Rodríguez"), who is in default, indicating she was accepted to the Program. (*Id.,* ¶ 14; *see also* Docket Nos. 30, 31). On January 16, 2007, Jayrie attended a workshop for the Program held at the law firm of McConnell Valdés in Hato Rey, which was also attended by defendant Rodríguez of the Program and César Hernández, Program Coordinator for the internships at TWC. At the workshop, Jayrie was made aware that attendance at Program activities was mandatory. (Docket No. 87, ¶¶ 15–17).

On the morning of January 18, 2007, Concepción and Viera brought Jayrie to the airport for her flight to Washington, D.C. Hernández and Rodríguez accompanied the Program interns on the first leg of the journey, from San Juan to Miami. At the international airport in San Juan, Rodríguez handed Jayrie a check for $300 to cover the plane ticket and first per diem payment. (*Id.,* ¶¶ 18–20). When the flight arrived in Miami, Rodríguez informed Jayrie he was no longer the Director of the Program and was leaving the Program altogether, and that he was moving to Florida with his girlfriend. (*Id.,* ¶¶ 21–22). Rodríguez resigned from his employment in the OSL effective January[3] 18, 2007. His last act as Director of the Program was to meet the selected candidates in the San Juan international airport and provide them with their first stipend checks. On that same date, he relocated from Puerto Rico. After his resignation, Rodríguez was

**3.** Both the defendants' statement of uncontested facts and the sworn statement on which this particular statement of fact is based say "February." Defendants have since filed errata informing the court that the sworn statement should have read "January." (Docket Nos. 87, ¶ 23; 87–1, ¶ 6; 114). Plaintiffs were given until April 28, 2011 to respond (Docket No. 111), but did not do so.

not authorized to act on behalf of the OSL or the Program. (*Id.*, ¶¶ 23–24). Francisco Domenech assumed direct responsibility over the Program upon Rodríguez's resignation. (*Id.*, ¶ 25). During the layover in Miami on January 18, 2007, Jayrie called Concepción and informed her that Rodríguez was no longer the director of the Program. (*Id.*, ¶ 26). Rodríguez did not travel with the Program interns on the last leg of the flight to Washington, leaving Hernández of TWC with the Program interns. (*Id.*, ¶ 27). During her time in Washington as part of the Program, there were no representatives from the Program with Jayrie. (*Id.*, ¶ 62).

Upon her arrival in Washington, D.C., Jayrie was assigned to share an apartment with three other interns, one of whom was from the Program. (*Id.*, ¶ 29). Jayrie attended an orientation held by TWC for all participating interns, including the students from the Program, on the morning of January 19, 2007. She failed to attend an orientation held specifically for Program students on the afternoon of the same day. (*Id.*, ¶¶ 30–31).

On or about January 21, 2007, Jayrie met with TWC's Managing Director, Peter Stephens, because she was concerned she did not have an internship placement yet. At the time, most of the Program participants did not yet have an internship placement. Stephens suggested Jayrie visit Congresswoman Nancy Pelosi's office to introduce herself and present her résumé. (Docket No. 87, ¶¶ 32–34). When she visited Rep. Pelosi's office the same day, Jayrie indicated to Rep. Pelosi's assistant that she had an internship confirmed in her office. (*Id.*, ¶ 35). After being informed that no one could meet with her at the time, Jayrie refused to leave. (Docket No. 91–5, p. 1). Rep. Pelosi's assistant called Stephens twice to express her concern about Jayrie's behavior. (Docket No. 87,

¶ 36). Jayrie did not call or speak with Stephens after visiting the congresswoman's office despite having been instructed to do so. (*Id.*, ¶ 37).

On January 22, 2007, Jayrie failed to attend either a Pentagon tour, a mandatory Program activity, or her first day of class at Johns Hopkins University, also a Program activity. (*Id.*, ¶¶ 38–39). That day, Jayrie visited the emergency room ("ER") at George Washington Hospital because she was suffering from a migraine and asthma. She excused herself with Program personnel because she missed what would have been her first day of school. On the train on the way back to her apartment, a couple unknown to her noticed she looked ill, called her roommate, and waited with Jayrie at the train station until her roommate was able to get her. (Docket No. 91, ¶ 4).

Jayrie's behavior between January 18 and 23, 2007 raised concern among her roommates, staff at TWC, and staff at the residential building where she lived. (Docket No. 91, ¶ 1). TWC learned of Jayrie's behavior from TWC resident assistants ("RAs") in Jayrie's building and from a building manager. (Docket No. 91–2, p. 1, 19). The behavior observed included crying, displaying disruptive and angry behavior toward the other students, and difficulty interacting with her peers. She also handed out business cards to strangers in her building, which, according to TWC employee Jennifer Clinton, TWC considered a safety risk to herself and other students. Clinton testified that the RAs did not mention any concerns about Jayrie's mental status, solely about her ability to get along with her roommates, which Clinton testified was not an unusual problem for students early in the semester. (Docket Nos. 91, ¶ 2; 91–2, p. 1–2, 16–17, 23–24). Clinton testified that previous TWC students had shown the type of

behavior Jayrie displayed, such as crying, anger, and inability to get along with other students, generally due to homesickness. (Docket No. 91–2, p. 19–22).

On January 23, 2007, Jayrie received from TWC representative Sonia Zaide an e-mail which was copied to TWC employees and/or representatives Stephens, Hernández, Virginia Gergoff, Arleen Borysiewiez, and Ivette Morales. The e-mail, titled "Warning E–Mail," informed Jayrie she had failed to attend the mandatory Pentagon tour or the mandatory Program orientation on the afternoon of January 19 and had failed to report to Managing Director Stephens on the day of her visit to Pelosi's office, despite his instructions to do so. The e-mail also noted Jayrie's conduct and false statement about having an internship when visiting Rep. Pelosi's office. (Docket Nos. 87, ¶¶ 40–44; 91–5, p. 1). The e-mail, which was copied to several TWC employees and/or representatives, requested to meet with Jayrie the next day at 9:30 a.m. in order to "discuss our expectations from you." Jayrie was warned that "failure to do so will indicate that you no longer wish to be in the program and we will administer student discharge procedures as noted in the student handbook." (Docket No. 91, ¶ 5). The student handbook to which the e-mail referred was handed to Jayrie during the first orientation, along with other documents. (Docket No. 87, ¶ 45).

On January 23, 2007, after the "Warning E–Mail" had been sent and before TWC made the decision to expel Jayrie, staff from TWC spoke with Rodríguez regarding Jayrie's behavior. (Docket Nos. 91, ¶ 6; 91–2, p. 13–14). Although he was not in Washington and had not seen or had any contact with Jayrie after he left the Program group in Miami, Rodríguez agreed that Jayrie should not participate in the Program; he did not object to TWC's suggestion that Jayrie was not

ready for it. (*Id.*, ¶ 8; Docket No. 91–2, p. 6, 13–15). TWC's protocol is to consult with their partners to obtain input or information before TWC terminates a student. In Jayrie's case, that partner was the Program. (Docket No. 91, ¶ 7).

Clinton testified that she authorized the decision to expel Jayrie from the Program subsequent to her phone call with Rodríguez. (Docket No. 91–2, p. 11, 13–14). At around 5:00 p.m. on the afternoon of January 23, 2007, Rodríguez called Concepción and told her Jayrie had been expelled from the Program due to "erratic behavior" and that Jayrie needed to return to Puerto Rico immediately. (Docket No. 91, ¶ 9). Concepción was aware that Rodríguez was in Florida at the time. (Docket No. 87, ¶¶ 46–47). The same day, Jayrie received a phone call from Rodríguez on her cell phone informing her that she was expelled from the Program and needed to pack her belongings and return to Puerto Rico as soon as possible. (Docket Nos. 87, ¶ 48; 91, ¶ 10).

After her conversation with Rodríguez that afternoon, Jayrie went walking outside her apartment complex in cold weather wearing only shorts and a T-shirt. (Docket No. 87, ¶ 49). She ended up in a Lexus dealership, where she attempted to buy a car for $30. A dealership employee bought her jeans and a coat and contacted the police, who took her to the ER of the Inova Mount Vernon Hospital in Alexandria, Virginia. She was admitted to the ER on the evening of Tuesday, January 23, 2007, and from there committed to the Northern Virginia Mental Health Institute ("NVMHI"), where she was diagnosed with bipolar disorder type 1, manic episode with psychotic features. (*Id.*, ¶¶ 50–52; Docket Nos. 91, ¶¶ 11–12; 91–6, p. 1).

Although Jayrie and Concepción communicated constantly while Jayrie was in Washington, Concepción did not notice

anything different in Jayrie's mood or way of speaking during any of their conversations; Jayrie sounded normal. (Docket No. 87, ¶¶ 55–56). The January 23 episode was the only time Jayrie went outside in cold weather without appropriate clothing. (*Id.,* ¶ 53). Jayrie testified during her deposition that she is not aware whether anyone at TWC or the Program observed, or was told by her roommates, that she was presenting symptoms such as talking senselessly or going outside dressed inappropriately for the weather. (Docket No. 87, ¶¶ 60–61; 87–4, p. 41–42). Jayrie also testified that she is not aware whether TWC provided any information to the Program regarding her situation. (Docket No. 87, ¶ 63).

Jayrie testified that she began hearing voices for the first time after being admitted to the Inova Mount Vernon ER. (Docket Nos. 87, ¶ 54; 87–4, p. 35). According to her discharge paperwork from NVMHI, Jayrie told the psychiatrist at Inova Mount Vernon that she had been "hearing voices," "dreaming about Jesus Christ," and feeling she had a "special gift" during this time. (Docket Nos. 91, ¶ 3; 91–6, p. 2). Previously, Jayrie had been treated at age 15 for an episode of post-traumatic stress disorder ("PTSD"). She received treatment for a year, including psychological treatment and medication with antidepressants. After this episode of PTSD, Jayrie functioned normally until the manic episode that began upon her arrival in Washington, D.C. (Docket No. 91, ¶¶ 13–14).

On January 23, 2007, Jayrie's aunt spoke with Isabel Santa, the Resident Assistant at Jayrie's apartment building, and asked Santa to give her phone number to a person in charge of the Program who could give her information about Jayrie. Three or four days later, while Jayrie was in the hospital, Rodríguez called Jayrie's aunt and assured her Jayrie would be readmitted to the Program after she got better. (Docket No. 91, ¶¶ 15–16). When Stephens spoke with Jayrie's mother, Concepción, by phone the day after Jayrie's hospitalization, Stephens told her that Jayrie had been expelled from the Program due to her health condition. Stephens made no such comments during an in-person meeting he and TWC staffer Virginia Gergoff held at TWC with Concepción (and, via teleconference, Domenech) while Jayrie was still hospitalized in February 2007. (Docket Nos. 87, ¶ 57; 87–7, p. 11–12; 91, ¶ 17; 91–1, p. 10–17).

Jayrie never personally requested either reconsideration by TWC regarding her expulsion or readmission to the Program, as she was hospitalized at NVMHI. She was never able to speak to someone from the Legislative Assembly about her expulsion. (Docket Nos. 87, ¶¶ 58–59; 87–4, p. 36–37). During the in-person meeting at TWC while Jayrie was hospitalized, Concepción requested information about TWC's disciplinary committee and its expulsion policies. She provided a handwritten authorization from Jayrie for Concepción to request information about her. Stephens and Gergoff declined to provide the requested information. (Docket No. 91–1, p. 13–17).

According to a sworn statement by Domenech, he received a call at one point from a TWC representative to inform him that Jayrie's behavior was inconsistent with the standards TWC expected from the participants of its internship programs, but that she was going to be given an opportunity to correct her conduct and continue in the Program. (*Id.,* ¶ 64). The decision to expel Jayrie from the Program was made by TWC and was communicated to Domenech after the decision had been put into effect. At the time, Domenech was informed that TWC had made the

decision to expel Jayrie from the Program because her behavior was inconsistent with TWC's standards. (*Id.*, ¶¶ 65–66). Domenech was never informed that TWC's decision to expel Jayrie was due to any mental condition from which she might have been suffering. At the time that Domenech was notified of the decision to expel her from the Program, Domenech was unaware that Jayrie suffered from any mental condition, much less bipolar disorder, or was disabled in any way. (*Id.*, ¶¶ 67–68).

Plaintiffs' case was removed from the Commonwealth courts to this court on December 10, 2008. The original state-court complaint included TWC as a defendant, but TWC was dropped from the amended complaint. (*Id.*, ¶¶ 69–70; Docket No. 10–3).

## DISCUSSION

Defendants Commonwealth, House, and Senate move for summary judgment on plaintiffs' claims under Title II of the ADA, the Rehabilitation Act, and Puerto Rico law. (Docket No. 88). The court discusses each in turn.

### I. Title II of the ADA

■ Congress enacted Title II of the ADA to prohibit "discrimination by governmental entities in the operation of public services, programs, and activities." *Toledo v. Sánchez*, 454 F.3d 24, 30 (1st Cir. 2006); 42 U.S.C. § 12132. Title II imposes an affirmative obligation on public entities to make their programs accessible to qualified individuals with disabilities, except where compliance would result in a fundamental alteration of services or impose an undue burden. *Toledo*, 454 F.3d at 32 (citations omitted). To survive summary judgment, a plaintiff alleging discrimination under Title II must raise evidence, sufficient to raise a genuine issue of material fact, from which a reasonable factfinder could conclude: (1) that she is a qualified individual with a disability; (2) that she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits or discrimination was by reason of her disability. *Id.* at 31–32 (citations omitted); *Forestier Fradera v. Municipality of Mayaguez*, 440 F.3d 17, 21–22 (1st Cir.2006) (citation omitted).

■ The moving defendants do not dispute that Jayrie meets the first prong, but argue that plaintiffs cannot meet the second or third requirements. (Docket No. 88, p. 7–15). Under the second prong, while Jayrie's expulsion certainly excluded her from participation in the Program, defendants argue that this action was taken by TWC, not by defendants. (*Id.*, p. 8–12). The court agrees: the undisputed facts show that it was TWC that made the decision to expel Jayrie from the Program; Clinton testified that she authorized that decision. While TWC staff called Rodríguez before finalizing the decision, it is undisputed that Rodríguez had resigned from his job with the Program on January 18, 2007, and that Rodríguez was not authorized after his resignation to act on behalf of the OSL or the Program. And the undisputed facts show that Domenech, who became Program Director upon Rodríguez's resignation, did not learn of the expulsion until it had already been put into effect.

Plaintiffs insist that Rodríguez was acting as a representative of the Program when he spoke with TWC, then with Jayrie and her mother. (Docket No. 92, p. 10). However, plaintiffs have not shown that Rodríguez was acting as the Program's legal agent at the time, since it is undisputed that he was not authorized to do so. Moreover, his agency status is

ultimately immaterial: the evidence shows that the decision to terminate a student is up to TWC, and TWC alone.[4] Concepción testified that she assumed that it was Rodríguez's decision to expel Jayrie from the Program because he was the one who called Concepción. (Docket No. 87–7, p. 13). But although Clinton's testimony shows that TWC's protocol was to get input from the representative of a student's school to get insight about the student's situation before terminating a student, there is absolutely no evidence that the representative has any say in the decision. And the most Clinton's testimony shows is that Rodríguez did not object to the proposed expulsion. (Docket No. 91–2, p. 6, 11). Accordingly, plaintiffs have not shown that, even if Rodríguez was acting as an agent of the defendants, he was the one to expel her. Since TWC, not the defendants or Rodríguez, expelled Jayrie, plaintiffs have not met the second prong of the *prima facie* Title II case.

Under the third prong, the moving defendants argue that even if they did have a role in Jayrie's expulsion, plaintiffs cannot show that the expulsion was "by reason of" her health condition because defendants had no knowledge of Jayrie's mental health condition prior to her expulsion. (*Id.*, p. 12–15). Plaintiffs respond that "there is clear, undisputed evidence" that Rodríguez was informed and consulted by TWC staff about Jayrie's "situation" *prior* to January 23, 2007. (Docket No. 92, p. 10). Regardless of Rodríguez's agency status at the time, this contention is not supported by the record. There is no evidence that TWC staff passed on the comments from Jayrie's RAs and building manager to Rodríguez or any of the moving defendants prior to TWC's January 23 phone call with Rodríguez.

It is undisputed that Jayrie left blank the sections of the Program application for communicating any special needs or conditions she had. The undisputed facts also show that Domenech, the Program's Director, was never informed that TWC's expulsion decision was due to any mental condition, and that when notified of that decision, Domenech was unaware that Jayrie suffered from any mental condition. Moreover, there is no evidence that anyone at TWC or the Program observed Jayrie's behavior (no Program representatives were with Jayrie in Washington) or that they were told about it by her roommates. And there is no indication that Rodríguez informed the moving defendants about Jayrie's "erratic behavior" between TWC's phone call to him on January 23, 2007 and TWC's expulsion of Jayrie that same day. Accordingly, plaintiffs have not shown that the moving defendants discriminated against Jayrie "by reason of" her mental condition, even assuming they had any role in her expulsion.

Citing *Miller v. Nat'l Cas. Co.*, 61 F.3d 627, 630 (8th Cir.1995), plaintiffs argue that Jayrie's "erratic behavior" was a symptom of her mental disability, so knowledge of her disability at the time of the expulsion may be imputed to defendants. (Docket No. 92, p. 6–7, 10–12). This citation does not help plaintiffs. In *Miller*, the court affirmed summary judgment for the defendant where the plaintiff had not disclosed her mental impairment, finding that "since [defendant] did not know of [plaintiff's] disability until after her employment was terminated, it would have been impossible for the company to

---

4. For this reason, the fact that Stephens, a TWC employee, told Concepción by phone while Jayrie was hospitalized that Jayrie was expelled for her mental condition does not create a material fact issue as to whether the moving defendants discriminated against Jayrie.

have made that disability the basis for the termination." 61 F.3d at 630. Likewise, here, as noted, Jayrie did not disclose any mental condition on her Program application, and the moving defendants had no knowledge of Jayrie's "erratic behavior" before her expulsion; only TWC and Rodríguez did.

Furthermore, the *Miller* court found that to the extent the defendant knew of the plaintiff's symptoms before terminating her, those symptoms "were not so obviously manifestations of an underlying disability that it would be reasonable to infer that [her] employer actually knew of the disability." *Id.* The same is true of Jayrie's behavior. As defendants note (Docket No. 106, p. 4), the evidence does not show that TWC considered Jayrie's behavior before her expulsion to be indicative of a mental condition. Prior to January 23, Jayrie's RAs never expressed concerns to TWC about Jayrie's mental status. And TWC staff did not consider it unusual for a student to display the sort of behavior that the RAs did report, due to homesickness or problems getting along with new roommates. TWC's "Warning E-Mail" made no mention of Jayrie's crying or angry or disruptive behavior; rather, it admonished her for missing the mandatory afternoon orientation session and the Pentagon tour and for falsely telling staff at Rep. Pelosi's office that she had a confirmed internship there. While such conduct could arguably be symptoms of a manic episode, it is not so obviously a manifestation of bipolar disorder as to render it reasonable to impute actual knowledge of the disorder even to TWC or Rodríguez, much less to the moving defendants.

Finally, plaintiffs argue that even after her expulsion, defendants discriminated against Jayrie because they "threw obstacles in [plaintiffs'] way which made it impossible for them to find out what had happened." (Docket No. 92, p. 12).[5] There is no evidence supporting this contention. While the record shows that TWC declined to provide information to Jayrie's parents even with authorization from Jayrie, there is no indication that any of the defendants did so, even assuming such behavior could constitute discrimination under Title II.[6]

In sum, plaintiffs have failed to show that the moving defendants expelled Jayrie from the Program as required to meet the second prong of the *prima facie* Title II case, or that her expulsion was "by reason of" her mental health condition under the third prong. I therefore **grant** summary judgment to the moving defendants on plaintiffs' ADA claim.

## II. Rehabilitation Act

 Section 504 of the Rehabilitation Act proscribes discrimination against disabled individuals in any program or ac-

---

5. The court has previously ruled that plaintiffs cannot proceed on a "failure to accommodate" theory under the ADA. (Docket No. 72). To the extent that plaintiffs are attempting to use evidence of TWC's denial of information for such a claim at this stage, the court will not entertain it.

6. Defendants devote a great deal of space in their third-prong argument to a theory of independent contractor negligence, assuming TWC is viewed as an independent contractor for the defendants. (Docket No. 88, p. 10–

12). Plaintiffs respond that this theory "is of no application in this case" since it is unsupported by the evidence. (Docket No. 92, p. 12–13). The court agrees. Plaintiffs then go on to argue that even if TWC were an independent contractor, it was Rodríguez, as the Program's representative, who "set in motion the discriminatory treatment of Jayrie with regard to her expulsion and subsequent lack of access" to the Program. (*Id.*). The court has already rejected these contentions.

tivity that receives federal funding. 29 U.S.C. § 794(a). Federally-funded entities are thus prohibited under Section 504 from discriminating against students with disabilities. *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70 (2d Cir.2000). A federally-funded organization violates Section 504 if it denies a qualified individual with a disability a reasonable accommodation that the individual needs in order to enjoy meaningful access to the benefits of public services. *See Alexander v. Choate*, 469 U.S. 287, 301–02 & n. 21, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). To prevail on a Section 504 discrimination claim, a plaintiff must show that (1) she is disabled, (2) she sought to participate in a federally-funded program or activity, (3) she was "otherwise qualified" to participate, and (4) she was denied participation "solely by reason of her ... disability." *Lesley v. Hee Man Chie*, 250 F.3d 47, 52–53 (1st Cir.2001) (citing 29 U.S.C. § 794(a)).

The moving defendants argue that even if the Program is a "federally funded program or activity" under Section 504, which they deny, plaintiffs have not established the third and fourth prongs of the *Lesley* test because Jayrie failed to comply with the Program's requirements (prong three) and that neither defendants nor TWC knew about Jayrie's condition prior to her expulsion (prong four). (Docket No. 88, p. 16–17). Plaintiffs respond that Jayrie was exhibiting symptoms of mental illness before her expulsion and that her behavior that contravened Program requirements was likewise a symptom of her alleged disability. (Docket No. 92, p. 10–12).

Plaintiffs' claim of discrimination is analyzed under the same standards as those used to determine whether Title II has been violated. *See Tardie v. Rehabilita-*

*tion Hosp. of R.I.*, 168 F.3d 538, 542 (1st Cir.1999). For the reasons discussed *supra* with regard to Title II, plaintiffs' Section 504 claim also fails. It is undisputed that Jayrie failed to attend several mandatory activities prior to her expulsion, made a misrepresentation to Rep. Pelosi's assistant, and then refused to leave the congresswoman's office. Since she missed several mandatory activities, plaintiffs cannot show that Jayrie otherwise met the Program's qualifications after her arrival in Washington. Furthermore, the "Warning E–Mail" and Clinton's testimony show that Jayrie's absenteeism and behavior at Rep. Pelosi's office were grounds for her warning and subsequent termination, so plaintiffs cannot show that she was expelled *solely* by reason of her disability. Moreover, as discussed *supra*, neither TWC, Rodríguez, nor the moving defendants knew of Jayrie's mental condition prior to her expulsion, and her conduct is not so obviously a manifestation of bipolar disorder to impute actual knowledge to TWC or any of the defendants. Because plaintiffs cannot meet the third or fourth prongs of the *prima facie* case for discrimination under Section 504, the court **grants** summary judgment to the moving defendants on plaintiffs' Rehabilitation Act claim.[7]

### III. Plaintiffs' Claims Under Puerto Rico Law

Next, defendants argue that plaintiffs' claims for disability discrimination under Law 44, 1 L.P.R.A. §§ 501–511(b), and the Puerto Rico constitution, P.R. Const. art. II, § 1, should be dismissed. (Docket No. 88, p. 17–22). In cases where the plaintiffs' federal claims are dismissed, "the balance of factors to be

---

**7.** I therefore need not resolve defendants' alternative argument that summary judgment is appropriate because the Program is not a "federally funded program or activity" under Section 504. (Docket No. 88, p. 15–16).

considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1177 (1st Cir.1995). The use of supplemental jurisdiction in these circumstances is completely discretionary, and is determined on a case-by-case basis. *Id.; see also Rodríguez Cirilo v. García*, 908 F.Supp. 85, 92 (D.P.R.1995) ("The assertion of supplemental jurisdiction over state law claims is within a federal court's discretion. If federal law claims are dismissed before trial, however, the state law claims should also be dismissed.") (citations omitted). Because I have dismissed all federal claims against the moving defendants, I likewise **grant** summary judgment to the moving defendants on plaintiffs' Puerto Rico law claims.

### IV. Failure to Join Indispensable Party

 Finally, defendants argue that under Federal Rule of Civil Procedure 19(a), plaintiffs' failure to join TWC as a party in the present action is an independently sufficient ground for dismissal of the case. (Docket No. 88, p. 22–24). Plaintiffs respond that under First Circuit law, a joint tortfeasor such as TWC is not an indispensable party. (Docket No. 92, p. 9) (citing *Castro–Cruz v. Municipality of San Juan*, 643 F.Supp.2d 194, 198 (D.P.R. 2009)). The court agrees with plaintiffs that under Rule 19, "a person potentially liable as a joint tortfeasor is *not* a necessary or indispensable party, but merely a permissive party subject to joinder under Rule 20." *Pujol v. Shearson Am. Exp., Inc.*, 877 F.2d 132, 137 (1st Cir.1989) (citation omitted) (considering whether non joined party's "initial wrongdoing" and defendant's subsequent act "together may have caused" co-plaintiff's injuries). The

court will not dismiss the action based on Rule 19(a), particularly since such a basis for dismissal is unnecessary in light of my holdings above.

### CONCLUSION

For the reasons stated above, the court **GRANTS** defendants Commonwealth, House, and Senate's motion for summary judgment (Docket No. 88) on all claims. Furthermore, since moving defendants House and Senate are sued through defendants McClintock and Aponte (Docket No. 10–3, ¶ 4), the court likewise **DISMISSES** all claims against defendants McClintock and Aponte. Partial judgment to be entered accordingly.

**IT IS SO ORDERED.**